OVERTON, J.
 

 The present suit is one brought by Mrs. Henry E. Belden, now Mrs. Leila Livermore, to recover from the Great Eastern Casualty Company and the Union Indemnity Company, in solido, the amount of an accident policy, namely, $7,500, and also $7,500, as penalty provided by Act No. 310 of 1010, and reasonable attorney’s fees, as provided by that act. The policy was issued by the Great Eastern Casualty
 
 &
 
 Indemnity Company; of New Vork, a company which was admittedly later absorbed by the Union Indemnity Company, of New Orleans.
 

 By the terms of the policy, Dr. Henry E. Belden, a graduate physician and practicing dentist, who caused the policy to issue, was insured “against the effects of bodily injuries caused directly, solely and independently of all other causes by accidental means, which bodily injuries or their effects shall not be caused wholly or in part, directly or indirectly by any disease, defect or infirmity.”
 

 Dr. Belden was struck by an automobile on the evening of December 24, 1929, and received severe rupture of the muscle of the calf of the right leg, also a much slighter injury to the left leg, and a comparatively slight scalp wound. On January 8, 1930, Dr. Belden, then being at his home, after going downstairs, with aid, and after being down there for a while, suddenly collapsed, remained in a semiconscious state until the next morning at 5 o’clock, when he died.
 

 The defense, tersely stated, is, in effect, a denial of the allegation that Dr. Belden’s death was due solely, and independently of all other causes, to the accident.
 

 There was judgment for plaintiff for $7,500, the amount of the policy, with legal interest from January 9, 1930, until paid; the court not allowing plaintiff’s demand for the penalties of $7,500 and reasonable attorney’s fees. The defendants have appealed. Plaintiff is satisfied with the judgment, since she asks for no amendment.
 

 To state the issue more specifically, it is the contention of plaintiff that Dr. Belden’s death was due to the accident, as its proximate cause, acting independently of all other causes, either directly or indirectly. It is her contention that the rupture of the muscle in the calf of the right leg, known as the “gastrocnemius” muscle, caused an extensive hemorrhage in that region, which is not disputed ; that the hemorrhage came from injured vessels; that later, in these vessels, the blood underwent coagulation or clotting; and that, still later, a part of the blood clot,
 
 *613
 
 the part being termed an “embolus,” became dislodged, probably due to the exercise in coming downstairs from his bed, and was swept by the blood stream to the heart, and from there to the lungs, causing death, the cause of death being termed “pulmonary embolism.”
 

 On the other hand, it is the contention of defendants that death was not due solely and independently of all other causes to the accident, but was brought about by a condition or disease of the heart, termed “chronic myocarditis,” accompanied at the end with acute dilation of that organ.
 

 “Chronic myocarditis,” we judge from the evidence of one of the experts, is a term synonymous with “fibrous myocarditis,” which means a replacement of the muscle fibers of the heart with connective tissue fibers, the heart being one of the organs in which there is never regeneration of the functionating tissue. The condition or disease, whichever it may be, we also infer from the evidence, weakens and enlarges the heart. It is a condition not uncommon with persons who have attained the age of seventy, and is usually of slow progress. It is also the position of defendants that, if Dr. Belden’s death was not due solely to chronic myocarditis, this condition was a contributing cause to it.
 

 In the forenoon of January 8, 1930, Dr. Belden left his room for the purpose of going downstairs to witness a carpenter do some work about the place. His left leg had then about healed, and so had the scalp wound, but his right leg was still swollen and bruised, so much so that he could not put his foot on the floor. His physician had provided him with crutches, and encouraged him in walking to and from the bathroom, which Dr. Belden did about once a day, though the attending physician did not say whether he could go . downstairs. Dr. Belden was permitted to sit up, but it seems that he did this only once before going downstairs, and then only for a few minutes. He descended the stairway with the aid of his crutches and a friend. After a little, he went into the yard, where he sat down for a while, resting his right leg on a block, and there watched the carpenter at work. He then went in the house at about 10:30, lay down on a couch in the dining room to rest, and awoke at about 1:30. He then went into the kitchen, spoke to the cook, stood in the kitchen for a few minutes, and then went back to the dining room. The cook followed him immediately to the dining room to answer a telephone call. At this time Dr. Belden sat down, and when he did, he gave a slight outcry. This attracted the attention of the cook. She looked, and saw him shaking his head from side to side, and rolling his eyes. He was revived somewhat with a wet towel, and made a remark showing that he recognized that the end had come. He was permitted to remain on the couch, where he died some fifteen hours later.
 

 As is usual in such cases, an autopsy was had, the autopsy having been conducted by Dr. Hauser, a highly reputable young pathologist and assistant coroner of the parish of Orleans, acting in his official capacity. The proeSs verbal of the autopsy recites, throwing-aside medical terms, as far as possible, that death resulted from chronic myocarditis with acute dilatation, followed by a severe physical injury, including rupture of the right gastrocnemius muscle with extensive hemorrhage. The protocol to the autopsy recites that the blood vessels of the chest were nega
 
 *615
 
 tive, excepting that there was some congestion. No embolus, or blood clot, was found in them. The kidneys were slightly contracted and congested, and showed a few healed tubercules. The spleen showed negative as also did the pancreas.
 

 Dr. Belden was examined some months before his death, and his heart appeared from the examination to be normal for a man of his age, though, in all probability, the chronic myocarditis was then present. Several days before hi's death Dr% Eshleman, on the suggestion of Dr. Belden’s son, who had had some experience in a hospital, and who had noticed a slight irregularity in his father’s pulse, with the consent of the attending physician, was called in. Dr. Eshleman found a slight irregularity in the beat of Dr. Belden’s heart, though, as we appreciate his evidence, found the heart virtually normal for a man seventy years of age.
 

 A number of physicians, including eminent specialists, some of them being members of. ■the Tulane faculty, were placed on the witness stand. The evidence of some of them supports the theory advanced by plaintiff as to the cause of death being due directly and solely to the accident, by reason of a clot of-blood becoming dislodged and finding its way into the blood vessels of the lungs, which frequently means sudden, or comparatively sudden, death. The evidence of others of the physicians — about an equal number — supports the finding of the coroner. These physicians see no reason to go behind his autopsy. The autopsy is criticized by some of them, though they recognize the ability of the assistant coroner, as not going sufficiently far to be determinative in a case of this nature. The coroner, it may be observed, had no knowledge of the likelihood that such a ease as this would arise; at least, he had no recollection of possessing knowledge that Dr. Belden was insured against death by accident. The physicians^ supporting plhintifif’s theory, as we appreciate their evidence, take into consideration, and lay stress upon, all the circumstances surrounding the death, and the past history of the deceased.
 

 We might be inclined to adhere to the finding at the autopsy, were it not for the past history of the deceased, and the fact that plaintiff’s theory, as
 
 to
 
 the dislodged clot of blood, seems reasonable to us. These clots, it may be said, are not always easily found, and may be overlooked in an autopsy. The past history, to which we refer, is that Dr. Belden, up to the evening of the accident, was actively engaged in the profession of dentistry. He had always enjoyed excellent health. His life was quite active. During the last ten years of his life he was an active member of a hunting and fishing club. It has been established by reputable witnesses that it was his custom to visit the club at week-ends, upon which occasions he would go fishing or hunting, usually going by himself. In his hunting expeditions, he would drag his perogue -over levees, unaided. These hunts included duck hunting and jacksnipe hunting. Any one who has ever hunted jacksnipe in a sea marsh, knows what a strain it is on the human body to do so. Dr. Belden went on a hunt a week before the accident. After these expeditions, Dr. Belden did not seem to be unduly fatigued, but was the last to retire at night and the first to arise in the morning.
 

 While we do not question that Dr. Belden had chronic myocarditis, nevertheless, in
 
 *617
 
 these circumstances, we think it more in accord with the facts to hold that the sole cause of death, unaided by the condition of the heart, was pulmonary embolism — a condition brought on directly by the accident. In other words, while we think the burden of proof rests upon plaintiff to bring herself, as the beneficiary, within the terms of the policy, nevertheless, in our view, she has done so, by a fair preponderance of evidence.
 

 The judgment is affirmed.
 

 O’NIELL, C. J., dissents, being of the opinion that, even though the death of the insured was superinduced by the accident, the death was caused partly and indirectly by the disease called “myocarditis”; the policy of insurance being only “against the effects of bodily injuries caused directly, solely, and independently of all other causes, by accidental means, which bodily injuries or their effects shall not be caused wholly or in part, directly or indirectly, by any disease, defect or infirmity.”